IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TEACHERS INSURANCE
COMPANY, a Foreign Corporation,

      Plaintiff,

vs.

                                CASE NO.: 6:13-cv-1533-ORL-36TBS

FULMER, LEROY, ALBEE &
BAUMANN, P.L.C., JASON MOUSSA;
and MICHAEL W. LEROY,

      Defendants.

_____/

## COMPLAINT FOR PROFESSIONAL NEGLIGENCE
## AND DEMAND FOR JURY TRIAL

      COMES NOW the Plaintiff, TEACHERS INSURANCE COMPANY ("TIC"), by and through its undersigned counsel, and sues Defendants, FULMER, LEROY, ALBEE & BAUMANN, P.L.C.; JASON MOUSSA; and MICHAEL W. LEROY, and states:

      1.     This is an action for professional negligence.

      2.     This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. Section 1332, as the parties are of diverse citizenship.

      3.     Plaintiff, TIC, is a foreign corporation licensed and authorized to engage in the sale of insurance products with its principal place of business in Springfield, Illinois.

4.      Defendant, FULMER, LEROY, ALBEE & BAUMANN, P.L.C. ("FULMER LEROY") is a Florida Professional Liability Corporation with its principal place of business in Orlando, Orange County, Florida.

5.      Defendant, JASON MOUSSA, is an individual believed to be presently residing in New York, New York.

6.      Defendant, MICHAEL W. LEROY, is an individual believed to be presently residing in Orlando, Orange County, Florida.

7.      The amount in controversy in this action exceeds $75,000.00 exclusive of interest, costs and attorney's fees.

## PREDICATE FACTS

8.      On November 5, 2009, Cacshet Cicero was traveling west on Sorrento Road in the area of Escambia County, Florida when a truck driven by Kathryn Steward made an illegal U-turn in front of her.  Ms. Cicero was unable to avoid colliding with the truck and struck it on her driver's side at roughly 45 miles per hour.  The collision crushed the front end of her Honda and deployed both front air bags in the vehicle.  She was seriously injured, including the comminuted fracture of both her ankles. She was unable to get out of her vehicle after the crash, was removed by emergency personnel, and was thereafter taken to Baptist Hospital in Pensacola.

9.      The accident was reported to TIC on November 27, 2009 by James Cicero, Ms. Cicero's father.

10.    Ms. Cicero then requested permission to settle with Ms. Steward, the tortfeasor, to which TIC agreed.

11.    Ms. Cicero then sought uninsured/underinsured ("UIM") benefits from her father's two insurance policies, both of which were issued by TIC.

12.    On or about December 15, 2009, TIC retained Defendant, MICHAEL W. LEROY and his law firm, Defendant, FULMER LEROY, to provide a legal coverage opinion on the obligations of TIC to provide coverage for Ms. Cicero's UIM claim.  Defendant, JASON MOUSSA, was assigned by Co-Defendants to work with MICHAEL W. LEROY on the analysis and evaluation of this insurance coverage matter.

13.    On February 12, 2010, TIC received a settlement demand from Ms. Cicero's legal counsel for payment of the coverage limits of both of the TIC insurance policies insuring James Cicero, to be tendered within five days.  The demand letter noted that the policies provided stacked UIM coverage requiring payment under both policies and that any response should acknowledge that fact. Defendants were responsible for analyzing the legal obligations and advising TIC on the appropriate response to the demand of Cicero's legal counsel.

14.    Defendants failed to provide a coverage opinion to TIC in time to respond to the settlement demand within the five days.  On February 22, 2010, Defendants finally provided a coverage opinion which concluded that the Cicero UIM claim was not covered.  The opinion cited to the Florida Supreme Court's

decision in *New Hampshire Ins. Group v. Harbach*, 439 So. 2d 1383 (Fla. 1983), which purportedly interpreted Florida Statutes Section 627.4132 (Florida's Non-Stacking Statute) to preclude recovery under a resident relative parent's policy. However, Section 627.4132 was previously amended in 1980 to expressly permit stacking. Thus, the holding of *Harbach* was by its own language inapplicable, as the Court limited its holding in that case to "Section 627.4132 as it read between 1976 and 1980." *Harbach*, 439 So. 2d at 1385.

15.     The opinion then cited to decisions interpreting Section 627.727(9)(d), Florida Statutes, as permitting the "owned-but-not-insured" exclusion (discussed, *infra*) to bar UIM coverage where the insured is injured in a vehicle owned by the insured, but for which UIM coverage was not purchased under the subject policy. The opinion concluded that the following provision of the policies precluded coverage: "There is no coverage for bodily injury to an insured through being struck by a car owned by you or your relatives if the car is not insured for this coverage under this policy." However, that provision was never triggered by Ms. Cicero's claim, as she did not claim to have been struck by an owned-but-not-insured vehicle, but simply to have been operating such a vehicle when injured.

16.     Based on that erroneous coverage opinion, Defendants then wrote to Cicero's counsel denying coverage and rejecting the settlement demand.

17. On March 5, 2010, TIC received a second settlement demand from Ms. Cicero's counsel, again demanding the stacked limits of the two TIC policies. In the correspondence making the second settlement demand, Ms. Cicero's counsel included a copy of *Lewis v. Cincinnati Ins. Co.*, 503 So. 2d 908 (Fla. 5th DCA 1987), which held that an exclusion of UIM coverage for one household vehicle violated the Florida UIM statute and was therefore legally invalid. TIC immediately sent a copy of the new settlement demand to Defendants, requesting their analysis and legal advice in light of the *Lewis* case cited by Ms. Cicero's counsel.

18. In the meantime, TIC's adjuster requested an extension of time to March 31, 2010 in which to respond to the settlement demand. Ms. Cicero's counsel refused the request for an extension.

19. Defendants did not timely respond to TIC prior to the expiration of that second settlement demand.

20. On March 29, 2010, Ms. Cicero and her father filed suit against TIC.

21. On that same day, Defendants authored a second legal coverage opinion in which they again concluded that the TIC policies provided no coverage for Ms. Cicero's claim. In the second coverage opinion, Defendants attempted to distinguish the facts in the Cicero case from the *Lewis* case, asserting it was inapplicable as controlling legal precedent.

22.    Defendants filed a Motion to Dismiss the UIM complaint on the ground that it failed to allege any wrongdoing by TIC in responding to the claim of Ms. Cicero for her injuries.  The motion also raised other meritless defenses.

23.    Ms. Cicero's counsel amended the Complaint prior to a hearing on the Motion to Dismiss.

24.    On August 20, 2010, Ms. Cicero's counsel filed Civil Remedy Notices of Insurer Violation ("CRNs") with the Department of Financial Services alleging the claim had been improperly and wrongfully denied.

25.    Several days later, Defendants wrote to TIC advising that an Answer to the Amended Complaint and a Response to the CRNs were being prepared. Defendants filed those documents and maintained the claim of Ms. Cicero was not entitled to coverage for the reasons previously stated. Defendants subsequently filed a Motion for Summary Judgment with the court seeking a ruling that their interpretation should be upheld.

26.    On February 16, 2012, TIC received a letter from Defendants advising that the Court had denied TIC's Motion for Summary Judgment, "as the judge felt that the policy runs to the named insured, not to a particular vehicle, as the policies were stacked.  We have 10 days to appeal the decision and I think we need to," even though no legal right of appeal existed at that time.

27.    On March 26, 2012, TIC received an IME report from Dr. Shane Vervoort. The report assigned Ms. Cicero a 14% total body permanent impairment rating based upon the multiple comminuted fractures to her ankles.

28.    On June 18, 2012, the case was mediated, resulting in an almost immediate impasse. Plaintiff's counsel demanded $400,000 and refused to negotiate below that amount. At that point, TIC became aware of the possibility of its exposure to an extra-contractual bad faith lawsuit and retained independent legal counsel to analyze the underlying coverage issue and the potential extra-contractual liability.

29.    TIC was then advised by its independent counsel that the prior legal opinions received from Defendants were based upon an erroneous analysis of the legal issues. A second mediation was arranged, in an attempt to resolve the claim as favorably as possible under the circumstances. Representatives of both FULMER LEROY and TIC were present at the mediation, FULMER LEROY being represented by attorney Todd Gretton.   Negotiations were lengthy and hard-fought. However, in the end it was clear that it would require payment of $450,000 to settle the case, considering Ms. Cicero's injuries, the lack of coverage liability defenses, and the amount of attorney's fees expended by Ms. Cicero's counsel in order to prosecute the case (which fees were recoverable by statute in addition to the policies' coverage limits, since coverage was challenged throughout the case).

The case was consequently settled for that amount and TIC paid the sum of $450,000 to resolve the claim.

30.    FULMER LEROY agreed at the mediation that the settlement amount was reasonable under the circumstances at that time.

## TIC POLICIES

31.    TEACHERS INSURANCE COMPANY issued two policies to James Cicero, for the policy period July 27, 2009 to January 27, 2010 (continuously renewed since 2007) with limits of liability of $50,000 per person/$100,000 per occurrence for liability to others and $50,000 per person/$100,000 per occurrence for UIM.   True and correct copies of the policies are attached hereto as Exhibits "A" and "B."

32.    Mr. Cicero executed a UIM selection form for both policies by which he selected UIM coverage limits equal to his bodily injury liability limits and selected stacking of coverage for the policies. Cacshet Cicero was listed as a driver on both policies.  One policy bears policy number 09-72803510 and insures a 2001 Ford F-150 (the "3510 policy") and the other bears number 09-72803520 and insures a 2001 Dodge Durango (the "3520 policy").

33.    The policies contain coverage J, which is UIM coverage, distinguishing between stacked coverage (Coverage JS) and non-stacked coverage (Coverage JN).  Coverage J provides in pertinent part:

> **Uninsured Motor Vehicle – Coverage JN (Non-Stacking) and JS (Stacking)**

*You* have this coverage if Coverage JN or JS is shown on the declarations page. *We* will pay damages for *bodily injury* an *insured* is legally entitled to collect from the owner or driver of an *uninsured motor vehicle*. The *bodily injury* must be caused by accident arising out of the operation or ownership of the *uninsured motor vehicle*.

\* \* \*

**What is not covered**

**There is No coverage:**

\* \* \*

3.  FOR *BODILY INJURY* TO AN *INSURED:*

a.  WHILE *OCCUPYING*; OR
b.  THROUGH BEING STRUCK BY: A *CAR* OWNED BY *YOU* OR *YOUR RELATIVES* IF THE *CAR* IS NOT INSURED FOR THIS COVERAGE UNDER THIS POLICY.

34.  The policies also contain a UIM endorsement specific to Florida, which states:

**What is not covered**

**There is no coverage:**

\* \* \*

The following is added:

**There Is No Coverage Under Coverage JN (nonstacked): -- This provision is added:**

1.   While *occupying* any *motor vehicle* owned by *you* or *your relatives* which is not insured for this coverage under this policy.  This includes a *trailer* of any type used with the *motor vehicle*.

35.   The policies contain the following definitions:

*You* and *Your* mean the named insured shown on the declarations page and the named insured's *spouse* if a resident of the same household.

\* \* \*

*Relative* means a *person* related to *you* by blood, marriage or adoption who lives with *you*.  It includes *your* unmarried and dependent child who is away at school.

## COUNT I
## LEGAL MALPRACTICE

36.   Plaintiff realleges paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37.   At all times material to this action, Defendants held themselves out as a law firm staffed by professional and experienced attorneys who were proficient and knowledgeable in the legal and factual issues involved with interpreting UIM coverage under Florida law.

38.   At all times material to this action, an attorney-client relationship existed between Defendants and TIC.

39.   At all times material to this action, Defendants MICHAEL LEROY, JASON MOUSSA and FULMER LEROY each owed a duty of care to TIC.

40.    Defendants breached their duty of care to TIC by:

a.    failing to properly interpret the policies at issue;

b.    failing to properly interpret and apply the statutes and case law applicable to the claim;

c.    failing to advise TIC to accept the initial opportunity to settle the claim for the $100,000 stacked policy limits;

d.    failing to advise TIC to accept the second settlement demand for the $100,000 stacked policy limits even after their initial coverage opinion was indicated to be erroneous;

e.    failing to advise TIC that it had a third and final opportunity to settle the claim for the $100,000 stacked policy limits by paying them within sixty (60) days of the acceptance date of the CRN.

f.    otherwise failing to exercise the professional standard of care of a law firm and its attorneys in advising TIC of its rights and obligations in responding to the claim at issue.

41.    Had Defendants properly interpreted the policies at issue, they would have recognized that the policies provided stacked coverage in the aggregate amount of $100,000.

42.    Had Defendants properly interpreted the applicable statutes and case law relevant to the claim and advised TIC regarding its obligation to pay the

coverage afforded under the policies, TIC would have settled the underlying case for $100,000.

43.    As a direct and proximate result of the Defendants' professional negligence, TIC was required to pay $450,000 to settle the underlying claim which previously could have been settled for $100,000, in addition to incurring additional attorney's fees to obtain a proper interpretation of the policies, and increased attorney's fees paid to the Defendants, all of which would not have been incurred but for the Defendants' negligence in failing to properly advise and represent TIC.

WHEREFORE, TIC prays for entry of judgment in its favor, together with prejudgment interest, costs and such other relief as the Court deems just and proper.

### COUNT II
### VICARIOUS LIABILITY

44.    Plaintiff realleges paragraphs 1 through 43 above as if fully set forth herein.

45.    Defendants, JASON MOUSSA and MICHAEL W. LEROY, were at all times material to this action employees and agents under the direction and control of Defendant, FULMER LEROY.

46.    Defendant, FULMER LEROY is liable to TIC for the actions of its employees and agents under the doctrine of *respondeat superior*.

47.    As a result of the negligence of Defendants, MICHAEL W. LEROY and JASON MOUSSA, Defendant FULMER LEROY is vicariously liable to TIC for all damages caused by the negligence of Defendants, MICHAEL LEROY and JASON MOUSSA.

WHEREFORE, TIC prays for entry of judgment in its favor, together with prejudgment interest, costs and such other relief as the Court deems just and proper.

## COUNT III
## BREACH OF IMPLIED CONTRACT

48.    Plaintiff realleges paragraphs 1 through 47 above as if fully set forth herein.

49.    TIC and FULMER LEROY entered into an implied-in-fact contract for FULMER LEROY to advise TIC regarding the coverage available and its obligations under the two policies issued to James Cicero.

50.    FULMER LEROY breached its obligations under the contract by:

a.    failing to properly interpret the policies at issue;

b.    failing to properly interpret and apply the statutes and case law applicable to the claim;

c.    failing to advise TIC to accept the initial opportunity to settle the claim for the $100,000 stacked policy limits;

d.    failing to advise TIC to accept the second settlement demand for the $100,000 stacked policy limits even after being shown that their initial coverage opinion was erroneous;

e.    failing to advise TIC that it had a third and final opportunity to settle the claim for the $100,000 stacked policy limits by paying them within sixty (60) days of the acceptance date of the CRN.

f.    otherwise failing to exercise the professional standard of care of a law firm and its attorneys in advising TIC of its rights and obligations in responding to the claim at issue.

51.    As a direct and proximate result of FULMER LEROY's breach of its obligations, TIC was forced to spend $450,000 to settle a case which it could and should have settled for $100,000 had FULMER LEROY not breached the contract.

52.    As a direct and proximate result of FULMER LEROY's breach of its obligations, TIC incurred additional fees from FULMER LEROY, as well as fees incurred to obtain a correct coverage opinion and other consequential damages.

WHEREFORE, TIC prays for entry of judgment in its favor, together with prejudgment interest, costs and such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted this 2ND day of October, 2013.

GUY E, BURNETTE, JR. P.A.

GUY E. BURNETTE, JR., ESQ.
TRIAL COUNSEL
Florida Bar No.: 0236578
geb@gburnette.com
3020 N. Shannon Lakes Dr.
Tallahassee, FL 32309
Telephone:   (850) 205-0480
Facsimile:   (850) 668-7972
Attorneys for Plaintiff, TEACHERS
INSURANCE COMPANY